UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

ROBERT PEARSON,                           :

                           Plaintiff,    :

                 - against -          :

ORANGE COUNTY AND SERGEANT GESSNER    :

                        Defendants.    :

------------------------------------------------------------------ X

            22-CV-09278 (PMH)

            **PROPOSED FINDINGS OF FACT**
            **& CONCLUSIONS OF LAW**

Pursuant to this Court's Order and Rule 6 of the Individual Rules of Practice of Judge Philip Halpern, the following is offered by the Defendants as their Proposed Findings of Fact and Conclusions of Law:

## **PROPOSED FINDINGS OF FACT**

On June 28, 2021, Plaintiff Robert Pearson (hereinafter "Plaintiff" or "Pearson") filed a lawsuit against "O.C.J. Medical Department of Orange County Jail" of which the underlying facts involved a use of force incident with Defendant Sergeant Nicholas Gessner. *See* Defendants' Exhibit A[1]. The Docket No. for this first lawsuit is 21-cv-05670. Pearson eventually filed an Amended Complaint on September 7, 2021, which specifically named Sergeant Gessner. *See* Exhibit B. Sgt. Gessner became aware of the Plaintiff's first lawsuit against him around September 24, 2021, which is when he submitted his Request for Defense & Indemnification to the Orange County Attorney's Office. *See* Exhibit E; Affidavit of Nicholas Gessner dated May 14, 2024 ("Gessner Aff.") at ¶ 4.

The Hon. Philip M. Halpern dismissed the aforementioned amended complaint by way of Memorandum Opinion and Order dated May 13, 2022. *See* Exhibit C. A Judgement followed dated May 16, 2022. *See* Exhibit D.

---

[1] All references are to the Defendants' Exhibit list as provided in the Joint Pre-Trial Order unless otherwise noted.

With regard to the period of incarceration that is relevant to the instant action, Plaintiff was booked and entered the Orange County Correctional Facility (OCCF) in Goshen, New York on May 3, 2022. At all relevant times, Plaintiff's status remained as a parole violator. While incarcerated at OCCF, Plaintiff filed his Notice of Appeal on May 31, 2022 regarding the May 13, 2022 Memorandum Opinion and Order and May 16, 2022 Judgement in the first lawsuit.

Due to his history of disruptive behavior, Sgt. Gessner thought it would be beneficial to assign Plaintiff certain trustee positions to help combat the negative outbursts he repeatedly exhibited against OCCF staff. Gessner Aff. at ¶¶ 5-6. Indeed, Plaintiff has an extensive disciplinary history and is generally known by staff to be hostile and problematic. *Id.* After a few weeks of exhibiting acceptable behavior, Sgt. Gessner had staff approach Plaintiff about becoming a trustee. Gessner Aff. at ¶¶ 7-8. Plaintiff expressed interest in doing so. A Trustee Request Form for Robert Pearson to become a housing unit trustee for the B-4 housing unit was granted on June 13, 2022. Gessner Aff. at ¶ 8; *see* Exhibit G. Sgt. Gessner approved adding Plaintiff to the B-4 housing unit payroll for two (2) jobs: Housing Unit Cleaning trustee and Shower Detail trustee. Gessner Aff. at ¶ 9; *see* Exhibit H. *See also* Affidavit of Michael Morris dated May 15, 2024 ("Morris Aff.") at ¶ 7. Plaintiff was officially added to the payroll list and began to work in these two positions on July 1, 2022. *See* Exhibit P.

On July 20, 2022, Sgt. Gessner decided to give Pearson an additional job as Floor Detail trustee due to his satisfactory performance. Gessner Aff. at ¶ 10; Morris Aff. at ¶ 8; *see* Exhibit I. Pearson began working in this position on July 29, 2022. *See* Exhibit P.

On August 22, 2022, Sgt. Gessner decided to give Pearson an additional job as a Paint Detail trustee due to his continued satisfactory performance. Gessner Aff. at ¶ 11; Morris Aff. at ¶ 9; *see* Exhibit J. Pearson began working in this position on August 26, 2022. *See* Exhibit P.

2

Corrections Officer Michael Morris is the Trustee Coordinator at OCCF. Morris Aff. at ¶ 3. Among many of his duties, he is responsible for ensuring that the trustee program remains within acceptable budgetary limits. *Id.* As a general policy, C.O. Morris tries to keep the amount being paid out to trustees between $1,800.00 to $2,000.00 per pay period. Morris Aff. at ¶ 4. This amount correlates to the average amount that OCCF will gain from Inmate Commissary accounts for the same time period. *Id.*

The Trustee Program Payroll list for September 10, 2022 through September 16, 2022 indicated an amount being paid to the trustees that was over budget, *i.e.*, $2,059.00 or $59.00 over budget. Morris Aff. at ¶ 10; *see* Exhibit Q. Based thereon, Sgt. Gessner decided to consolidate some of the "detail" trustee positions into the Housing Unit Cleaning trustee position. Morris Aff. at ¶¶ 12, 14; Gessner Aff. at ¶¶ 12-13. Therefore, Sgt. Gessner removed Plaintiff from his B4 Unit Shower Detail trustee position on September 21, 2022 and from his B4 Unit Floor Detail trustee position on September 24, 2022. *Id. See* Exhibits K and L. At this time, Plaintiff still had his Housing Unit Cleaning trustee position, which now encompassed the duties of his past positions as Shower Detail and Floor Detail trustee.

Despite these changes, the Trustee Program Payroll Lists for September 24, 2022 through September 30, 2022 indicated an amount of $1,983.00 being paid to the trustees, which was too close to the upper limits of the trustee payroll budget amount. Morris Aff. at ¶ 15; *see* Exhibit Q. C.O. Morris preferred to keep the amount closer to $1,800.00. Morris Aff. at ¶ 15; *see* Exhibit Q. Based thereon, on October 2, 2022, Sgt. Gessner removed Plaintiff from his Housing Unit Cleaning trustee position to again try and meet the unit's budgetary goals. Morris Aff. at ¶ 16; Gessner Aff. at ¶ 14; *see* Exhibit M. He thought it was best to remove Plaintiff because he could

3

nevertheless keep his Paint Detail trustee position, which was separate from cleaning and would not be at risk of being consolidated like the other details. Gessner Aff. at ¶ 14.

On October 6, 2022, following an evaluation by a Licensed Mental Health Counselor at OCCF, Plaintiff was placed on Special Watch status as a One-to-One for suicidal behavior. See Exhibit S. Based thereon, Sgt. Gessner removed Plaintiff from his remaining trustee position of Paint Detail. Morris Aff. at ¶ 17; Gessner Aff. at ¶ 17; see Exhibit N. Plaintiff's prior lawsuit against Sgt. Gessner was a not a consideration in Sgt. Gessner's decision to remove him from any of his trustee positions. Gessner Aff. at ¶ 15.

Thereafter, a medical directive ordered that Plaintiff be moved to the Medical-1 Housing Unit for observation and that he be placed in contact isolation. Gessner Aff. at ¶ 20-21; see Exhibits R, T, and U. Based on his experience, Sgt. Gessner believes that it was due to the Plaintiff either verbalizing or exhibiting symptoms of COVID-19. Gessner Aff. at ¶ 21.

On October 7, 2022, Plaintiff was stepped down from a One-to-One Special Watch status to 15-minute Log Supervision. Gessner Aff. at ¶ 22; see Exhibit V. On October 8, 2022, Plaintiff was cleared from Special Watch status per a medical directive. See Exhibit W. On October 8, 2022, Plaintiff was also moved from the Medical-1 Unit to the B-1 Unit due to a need for space in the medical unit. Gessner Aff. at ¶ 23; see Exhibit R. As Plaintiff's medical intervention needs were low, i.e., he was merely under a contact isolation order, he was moved to the B-1 unit which acts as an intake unit at OCCF. Therefore, although Plaintiff was still in contact isolation, he was placed in a unit with other new inmates, many of which would also be under contact isolation orders. Gessner Aff. at ¶ 23

On October 8, 2022, while being housed in the B-1 Housing Unit, contraband was found in Plaintiff's cell and an Inmate Misbehavior Report was issued. Gessner Aff. at ¶ 24; see Exhibit

X. Due to his extensive history of misbehavior reports on file and recent contraband infraction, once Plaintiff was cleared from contact isolation, Sgt. Gessner initiated his move into the maximum-security unit, which is the D-2 Housing Unit. Gessner Aff. at ¶ 25-26; *see* Exhibits Y, Z and AA. On October 9, 2022, Plaintiff was moved to the D-2 Housing Unit. *See* Exhibit R. At the time of the transfer, Plaintiff did not have any "no contact" orders active for the D-2 Housing Unit which would otherwise potentially prohibit the transfer or otherwise signal to the prison officials that they may be creating a potentially dangerous housing arrangement. Gessner Aff. at ¶¶ 27-28; *see* Exhibit BB. Plaintiff's prior lawsuit was not a consideration in Sgt. Gessner's decision to initiate Plaintiff's move to the D-2 Housing Unit. Gessner Aff. at ¶ 31.

Plaintiff never filed any grievances with regard to the conduct complained of in his instant complaint. Affidavit of Eric Colby dated May 15, 2024 at ¶¶ 11-16; *see* Exhibit EE. Nevertheless, Plaintiff commenced this lawsuit by filing the subject Complaint on October 28, 2022 – over 450 days since the initial lawsuit was filed.

**PROPOSED CONCLUSIONS OF LAW**

**CONCLUSION ONE:**

**The Court lacks subject matter jurisdiction in this case since Plaintiff failed to exhaust his administrative remedies prior to commencing the instant lawsuit as is required by the Prison Litigation Reform Act of 1995.**

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C § 1997e(a). The PLRA's exhaustion requirement "applies to all inmate suits about prison life, whether they involve general

circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citations omitted). Prisoners must utilize the facility's grievance procedures regardless of whether the relief sought is actually offered through these procedures. *Booth v. Churner*, 532 U.S. 731, 741 (2001) (holding that exhaustion is required "regardless of the relief offered through administrative procedures.").

Moreover, "[c]ourts have interpreted the provision to require complete exhaustion in accordance with institutional procedures." *Vazquez v. Parks*, (No. 02 Civ. 1735 (LAK) (HBP)), 2003 WL 1442087 at * 3 (S.D.N.Y. Feb. 4, 2003), aff'd by, 101 Fed.Appx. 365 (2d Cir. 2004). In other words, "[c]omplete exhaustion to the highest level is required for each claim." *Singh v. Goord*, 520 F.Supp.2d 487, 495 (S.D.N.Y. 2007) [internal citations omitted]. "Moreover, a claim must be completely exhausted prior to commencing suit. It is insufficient to take only limited steps towards exhaustion before commencing suit, or even to exhaust a claim entirely during the pendency of the case." *Schwartz v. Dennison*, 518 F.Supp.2d 560, 568 (S.D.N.Y. 2007), aff'd, 339 Fed. Appx. 28 (2d Cir. 2009).

The PLRA's mandatory exhaustion requirement is only excused when the administrative remedies at issue were unavailable to the inmate. *Ross v. Blake*, 136 S.Ct. 1850, 1858 (2016). However, a "denial of grievance forms does not, in itself, make administrative remedies unavailable." *Evans v. Aramark Food*, (No. 14 CV 6469 (NSR)), 2016 WL 1746060, at * 3 (S.D.N.Y. April 28, 2016). *See Silvagnoli v. Figueroa*, (No. 12 Civ. 7761 (AT)), 2014 WL 4160213, at * 4 (S.D.N.Y. Aug. 19, 2014 ("[Prison staff's alleged [repeated] refusal to give Plaintiff a grievance form does not render administrative remedies unavailable either, "[d]enial of [grievance] forms . . . does not itself constitute a denial of remedies."") (quoting *Indelicato v. Suarez*, 207 F.Supp.2d 216, 219 (S.D.N.Y. 2002)); *Armand v. Simonson*, (No. 12-CV-7709

6

(KMK)), 2016 WL 1257972, at * 22 (S.D.N.Y. Mar. 30, 2016) ("[N]o argument could be made that administrative remedies were not available to Plaintiff . . . by virtue of her allegation that . . . she was ignored by correctional staff in asking for supplies and grievance forms . . ." ) (alterations omitted)).

The OCCF has a multi-step grievance procedure that is detailed in the Inmate Handbook. The procedure is reviewed with all inmates, including Plaintiff, upon their entry into OCCF. Sgt. Colby, as the Grievance Sergeant, reviews all grievances and oversees any resulting investigations. Sgt. Colby's records confirm that Plaintiff only submitted one grievance during his incarceration at OCCF in 2022, and said grievance was regarding the jail's COVID-19 protocol, not Sgt. Gessner. There is no particular grievance form, although an inmate could ask for the facility-issued form. Any grievance received in the grievance box would have been reviewed and investigated by Sgt. Colby. As such, the evidence in this case establishes that Mr. Pearson could have at any time availed himself of the grievance procedure at OCCF. He failed to do so entirely and thus his claims should be barred under the PLRA.

Moreover, a complaint submitted to the New York State Commission of Correction does not satisfy completion of OCCF's grievance procedure. Even if it did, the record is clear that the only complaint about Sgt. Gessner to the Commission of Correction during this time period was in June 5, 2022 – well before the allegations of retaliation presently before the Court.

**CONCLUSION TWO:**

**There has been no evidence proffered by Plaintiff to establish the existence of any unconstitutional custom, policy or practice. Thus, any claim against the County of Orange or Sgt. Gessner in his official capacity must be resolved in favor of the Defendants.**

Under 42 U.S.C. §1983, a local government may be held liable for the constitutional torts committed by its officials, according to a municipal policy, practice or custom. *See Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690-91 (1978). Pursuant to *Monell* and its progeny, in order to establish a §1983 claim against a defendant in his official capacity, a plaintiff must identify the unconstitutional policy, practice or custom that caused his claimed injury. *See Bd. Of Cty. Com'rs of Bryan County v. Brown,* 520 U.S. 397, 403 (1997). "A plaintiff may satisfy the 'policy or custom' requirement by alleging one of the following: '(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervisory policy-maker must have been aware; or (4) a failure by policy makers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Tieman v. City of Newburgh,* (No. 13-CV-4178 (KMK)), 2015 WL 1379652 at *13 (S.D.N.Y. March 26, 2015) (quoting *Brandon v. City of New York,* 705 Supp. 2d 261, 276-277 (S.D.N.Y. 2010)). Moreover "a plaintiff also must establish a causal link between the municipality's policy, custom or practice and the alleged constitutional injury." *Tieman, supra* at *13.

Here, there is no evidence of any official policy of the OCCF, and thereby the County, to retaliate against inmates by removing them from trustee positions, calling them names or transferring their housing unit. Indeed, the operative complaint never mentions or identifies a policy nor was one produced during discovery.

In addition, Sgt. Gessner was not the final policymaker with regard to budgetary decisions or housing transfers. Instead, the evidence shows that Sgt. Gessner was merely following OCCF

8

policy with regard to making sure the amount being paid to the trustees did not exceed the dollar amount set by higher ranked administrative officials. Similarly, the decision to move Plaintiff to the D2 Housing Unit was no decision at all. Rather, upon a review of Plaintiff's most recent misbehaviors and in consideration of his behavioral history, Sgt. Gessner followed protocol by initiating Plaintiff's transfer to the maximum-security housing unit. There is only one maximum-security unit in OCCF, which is the D-2 unit. Thus, the decision to move him to any other unit would have been improper and arbitrary. *See Raphael v. Cnty. of Nassau*, 387 F. Supp. 2d 127, 132 (E.D.N.Y. 2005) ("[t]he mere fact that one of the alleged state actors was a Sergeant does not by itself make him a 'policymaker' for purposes of municipal liability").

There is also no evidence of a widespread and consistent policy or custom in this case. *See generally Brandon v. City of New York*, 705 F.Supp.2d 261, 276-77 (S.D.N.Y. 2010). Instead, Plaintiff merely points to his own experiences to try and form a basis of liability against the County. But "[a]n inmate cannot plausibly state a widespread practice simply by alleging his own experience and then extrapolating to the entire jail population." *Kirton v. Doe*, No. 20-CV-10860 (KMK), 2023 WL 2586279, at *9 (S.D.N.Y. Mar. 21, 2023). Accordingly, no *Monell* liability may be found under the third category of liability either.

Lastly, there is no evidence to establish *Monell* liability based upon a failure to train. Significantly, "[t]he elements of an identified training deficiency and a close causal relationship, which together require the plaintiff[] to prove that the deprivation occurred as the result of a municipal policy rather than as a result of isolated misconduct by a single actor, ensure that a failure to train theory does not collapse into *respondeat superior* liability." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 130 (2d Cir. 2004). There is no evidence identifying any training deficiency in this case, thus any claim under this category must also fail.

9

Based on the above, there is no evidence in the record that could support a claim for municipal liability. Thus, a finding should be entered in favor of Defendants County of Orange and Sergeant Nicholas Gessner in his official capacity.

## CONCLUSION THREE:

**The evidence does not support a finding that Sgt. Gessner retaliated against Plaintiff.**

"Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims 'with skepticism and particular care'". *Thaxton v. A. Simmons,* 2012 WL 360104 at *7 (N.D.N.Y. Jan. 5, 2012) (*quoting Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir. 2002). This is true "because virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds.*

"To establish a First Amendment retaliation claim, a plaintiff must show that "(1) his conduct was protected by the First Amendment, and (2) such conduct prompted or substantially caused defendant's action." *Lashley v. Wakefield,* 483 F. Supp. 2d 297, 300 (W.D.N.Y. 2007) [internal citations omitted]. To prevail on a First Amendment retaliation claim, Plaintiff must establish (1) that the speech or conduct at issue was protected, (2) that defendant took adverse action against plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir. 2003) (citing *Dawes v. Walker,* 239 F.3d at 492 [2d Cir. 2001]). "Once plaintiff makes these showings, defendants can avoid liability by demonstrating that they would have taken the same adverse actions even if plaintiff had never engaged in the protected conduct." *Spavone v. Fischer,* No. 10 CIV. 9427 RJH THK, 2012 WL 360289, at *3 (S.D.N.Y. Feb. 3, 2012). "Lastly, even if the plaintiff shows that the

defendant was motivated at least in part by retaliatory animus and the defendant *fails* to prove that, absent that retaliatory animus, he would have taken the same action, the plaintiff must still demonstrate that the causal connection between the defendant's action and the plaintiff's injury is sufficiently direct." *Id.* [internal citations omitted].

The filing of another federal lawsuit by an inmate-plaintiff is a protected activity. *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) [internal citation omitted].

"Adverse action," defined objectively, is "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir.2004) [*quoting Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)].

"Allegations of adverse actions alone, however, are insufficient to establish retaliation absent facts supporting an inference of a causal connection between the adverse actions and the protected conduct." *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* "The Second Circuit has found that a causal connection may be established by the temporal proximity between an inmate's lawsuit and an adverse action, evidence of the inmate's prior good behavior, and vindication in a proceeding arising from the alleged retaliation." *Spavone v. Fischer*, No. 10 CIV. 9427 RJH THK, 2012 WL 360289, at *5 (S.D.N.Y. Feb. 3, 2012).

It is well-settled that "[n]on-specific verbal threats, harassing comments and hostile behavior do not constitute adverse actions sufficient to state a retaliation claim." *Ross v. Westchester Cnty. Jail*, (No. 10 Civ. 3937 (DLC)), 2012 WL 86467, at * 7 (S.D.N.Y. Jan. 11,

11

2012) (collecting cases); *Davis, supra* at 353 (2d Cir. 2003) (sarcastic comments do not constitute retaliatory action).

Prison officials have broad discretion to transfer prisoners. *Montanye v. Haymes,* 427 U.S. 236, 243 (1976); *Meachum v. Fano,* 427 U.S. 215, 228 (1976). However, transfers may not occur solely in retaliation for the exercise of constitutional rights. *See generally Tolliver v. Jordan*, No. 19-CV-11823 (PMH), 2021 WL 2741728, at *6 (S.D.N.Y. July 1, 2021).

Any claim of retaliation based upon removal from certain trustee positions fails for multiple reasons. First, the evidence does not and cannot establish the requisite causal connection. The evidence in this case utterly refutes any perceived inference that the initial lawsuit by Plaintiff played any role in the decision to remove Plaintiff from his trustee positions. Any potential causal connection in this case was broken when it was established that Sgt. Gessner did not select Plaintiff as a trustee until well after the initial lawsuit commenced and the Notice of Appeal was filed. Instead, the evidence shows that the legitimate non-retaliatory reasons by Sgt. Gessner for removing Plaintiff, along with other trustees in his housing unit, from certain positions was based upon budgetary concerns. Moreover, the decision to remove Plaintiff from his final position as Paint Detail was necessitated when Plaintiff displayed suicidal behavior and was placed on a One-to-One watch. Here, there is no temporal proximity as the events in question occurred approximately 15 months after the initial lawsuit was filed. Moreover, the evidence suggests a history of disruptive behavior, not good behavior, on behalf of Plaintiff, and further there is no evidence of Plaintiff's vindication in any later proceeding. Lastly, even if Plaintiff could prove some retaliatory animus, which he cannot, the evidence establishes that Sgt. Gessner would have made the decision to remove Plaintiff from his trustee positions regardless.

Any claim of retaliation based upon Sgt. Gessner allegedly calling Plaintiff names like "princess" and "little girl" also fails because such actions are not adverse actions as a matter of law.

Finally, any claim of retaliation based upon Sgt. Gessner initiating a housing transfer also fails because the evidence shows Sgt. Gessner had to move Plaintiff to the maximum-security unit (D-2) due to his recent contraband infraction. Moreover, although temporarily placed in the intake unit so he could complete his contact isolation, Plaintiff could not permanently stay in the intake unit. His move to D-2 was necessary and appropriate, and, as previously established, the evidence shows it was not causally connected to the initial lawsuit.

**CONCLUSION FOUR:**

**Sgt. Gessner is entitled to qualified immunity, and thus he cannot be found liable in this case.**

"A government official may be entitled to immunity if (1) his conduct did not violate clearly established law, or (2) it was objectively reasonable for that official to believe that the action he took did not violate the law." *Fredricks v. Parrilla*, No. 20CV5738ATJLC, 2022 WL 3053654, at *12 (S.D.N.Y. Aug. 3, 2022) [internal citations omitted].

When evaluating an asserted qualified immunity defense, a court may begin by examining whether a reasonable officer in Defendant's position would have believed his or her conduct would violate the asserted constitutional right. *Gunn v. Malani*, No. 20-CV-2681 (KMK), 2023 WL 2664805, at *8 (S.D.N.Y. Mar. 28, 2023). Moreover, "the right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Id.* [internal citations omitted].

The evidence in this case establishes that it was objectively reasonable for Sgt. Gessner to

believe that his actions of removing Plaintiff from his trustee positions and initiating a housing transfer did not violate the law. Here, Plaintiff did not have these trustee positions at the time he commenced the initial lawsuit against Sgt. Gessner. Plaintiff did not himself request to be a trustee. Rather, Sgt. Gessner had staff approach Plaintiff to be a trustee in an attempt to reward him for his "good" behavior and give him a reason and opportunity to continue the more positive behavior he was exhibiting. But for Sgt. Gessner, Plaintiff would have never been selected for his trustee positions. Significantly, Sgt. Gessner knew about Plaintiff's lawsuit when he approved Plaintiff for the positions. Indeed, the Notice of Appeal had already been filed by the time Sgt. Gessner approved Plaintiff to begin working as a trustee.

Based upon the budgetary goals of the Sheriff's Office, Sgt. Gessner had a legitimate reason to remove Plaintiff from his various trustee positions. Sgt. Gessner's intention was to leave Plaintiff with a position less prone to being cut for budgetary reasons, thus leaving him with the Paint Detail position. However, once Plaintiff went on a One-to-One Suicide Watch, Sgt. Gessner had no option but to remove Plaintiff from this remaining trustee position. Based thereon, Sgt. Gessner could have reasonably believed that the decision to remove Plaintiff from certain trustee positions, ones that he gave him, did not violate clearly established law.

Even assuming that the name calling is true, a point that the Defendants do not concede, such actions are not adverse for the purpose of retaliation claims. Thus, Sgt. Gessner cannot be found to have clearly violated any law with regard to any name-calling.

Lastly, Sgt. Gessner initiated Plaintiff's transfer to the D-2 housing unit because Plaintiff was removed from contact isolation and had to be transferred to a permanent unit. Since he was recently found with contraband in his cell, Sgt. Gessner had no option but to move Plaintiff to the maximum-security unit, which is D-2 at OCCF. Thus, Sgt. Gessner did not violate any clearly

established laws in this regard, and it was objectively reasonable for him to believe no law was being violated.

Based thereon, the Court may find that qualified immunity applies to Sgt. Gessner's actions, necessitating a finding in favor of the Defendants.


Dated: Goshen, New York
      May 16, 2024

                              Respectfully submitted,

                              STEPHANIE Y. MIDLER
                              Assistant County Attorney
                              Richard B. Golden
                              County Attorney for Orange County
                              Attorney for the County Defendants
                              255-275 Main Street
                              Goshen, NY 10924
                              (845) 291-3150