UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROBERT PEARSON,

                Plaintiff,

          -against-

ORANGE COUNTY and SGT. GESSNER,

              Defendants.

**<u>OPINION & ORDER</u>**

22-CV-09278 (PMH)

---

PHILIP M. HALPERN, United States District Judge:

Robert Pearson ("Plaintiff") brings this action under 42 U.S.C. § 1983 against Sgt. Gessner ("Gessner" or "Defendant") for retaliation in violation of the First Amendment under 42 U.S.C. § 1983. (Doc. 1, the "Complaint").[1] Plaintiff alleges that he was retaliated against by Gessner in or about October 2022, after he filed the lawsuit titled *Pearson v. New York State et al.*, bearing Docket No. 21-CV-05670 (the "Underlying Lawsuit"), and upon naming Gessner as a defendant therein. (*Id.*). Plaintiff seeks monetary relief, including lost wages, past and future pain and suffering, and mental and emotional distress. (*Id.*; *see also* Doc. 161, "JPTO" at 10).

The Court conducted a bench trial in this action on January 27, 2026. The parties subsequently filed, at the Court's direction, post-trial briefs. (Doc. 175, "Def. Br."; Doc. 176, "Pl. Br.").

This Opinion and Order constitutes the Court's findings of fact and conclusions of law for purposes of Federal Rule of Civil Procedure 52(a)(1). To the extent any statement labeled as a finding of fact is a conclusion of law, it shall be deemed a conclusion of law, and vice versa. The Court, in addition to the witnesses' affidavits and testimony given in open court, has also drawn

---

[1] The Court so-ordered the parties' Stipulation pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure, dismissing without prejudice all claims asserted by Plaintiff against Orange County on February 5, 2026. (Doc. 178). Accordingly, the only remaining Defendant in the case is Gessner.

its findings of fact herein from the parties' undisputed Joint Stipulation of Facts (JPTO at 3-5)[2] and the admitted exhibits.

Upon a review of the proof adduced at trial and as detailed herein, analyzed under applicable law and for the reasons that follow, the Court concludes that the Complaint must be dismissed with prejudice and judgment must be entered in favor of Defendant.

## BACKGROUND

I.    The Parties

Plaintiff is an individual incarcerated in the custody of New York State Department of Corrections and Community Supervision ("DOCCS") and is currently housed at Green Haven Correctional Facility ("Green Haven"). (SF ¶ 1; Doc. 162).[3] Plaintiff was previously incarcerated at Orange County Correctional Facility ("OCCF") for multiple time periods, including the following: April 6, 2021 through September 2, 2021; October 18, 2021 through February 16, 2022; and May 3, 2022 through November 15, 2022. (SF ¶¶ 10-13). The allegations of retaliation concern the time period between May 3, 2022 and November 15, 2022. (Id. ¶ 14).

Gessner is an employee of Orange County, with a place of business at 110 Wells Farm Road, Goshen, New York, i.e., OCCF. (Id. ¶¶ 2, 16). Gessner has been employed by the Orange County Sheriff's Office ("OCSO") since April 26, 2006, starting off as a Corrections Officer at OCCF. (CE 4 ¶ 2).[4] Gessner was promoted to Sergeant on May 10, 2017, and retained this position

---

[2] The parties submitted a joint statement of Stipulated Facts, located on pages 3-5 of the JPTO. (JPTO at 3-5). The Court cites to the paragraphs of the parties' stipulated facts as "SF ___."

[3] While the Stipulated Facts indicate that Plaintiff was then-currently housed at Wende Correctional Facility, 3040 Wende Road, Alden, NY 14004, Plaintiff's counsel informed the Court by letter dated December 16, 2025 that Plaintiff has been relocated to Green Haven Correctional Facility. (See Doc. 162).

[4] The affidavits constituting direct testimony of certain witnesses were each marked at trial as Court Exhibits. Accordingly, the Court cites to the affidavits as "CE ___."

at OCCF during the period in which Plaintiff's allegations underlying this action occurred. (*Id.* ¶ 3; SF ¶ 16). Gessner was subsequently promoted to lieutenant on April 26, 2025. (CE 4 ¶ 2).

## II.    The Underlying Excessive Force Lawsuit

On June 28, 2021, Plaintiff filed the Underlying Lawsuit against "State of New York" and "O.C.J. Medical Department of Orange County Jail." (SF ¶ 3). On September 7, 2021, Plaintiff filed an amended complaint in the Underlying Lawsuit adding, among others, Gessner and Correction Officer Michael Morris ("Morris") as defendants. (*Id.* ¶ 5; CE 1 ¶ 5). The allegations detailed in the Underlying Action relate to Plaintiff's incarceration period at OCCF between April 6, 2021 and September 2, 2021. (SF ¶¶ 10, 11). By Order dated May 13, 2022, and upon motion by Defendants, this Court dismissed the amended complaint in the Underlying Lawsuit (SF ¶ 7); and on May 31, 2022, Plaintiff appealed that dismissal to the Second Circuit (*Id.* ¶ 9). Plaintiff was actively pursuing the appeal before the Second Circuit during the pendency of this action. (*See generally* Ex. 50). Upon resolution of the appeal and partial remand to this Court, as of the date of this Opinion and Order, the Underlying Lawsuit remains active. (SF ¶ 35).

## III.    The Instant Lawsuit

On October 28, 2022, Plaintiff filed the Complaint in the instant lawsuit under 42 U.S.C. § 1983 against Gessner and Orange County for retaliation in violation of the First Amendment. This action is premised on Plaintiff's previous filing of the Underlying Lawsuit in September 2021 and actions purportedly taken by Gessner against Plaintiff during his incarceration period between May 3, 2022 and November 15, 2022. (*Id.* ¶¶ 32, 33; Doc. 1). Though Plaintiff was also incarcerated at OCCF between October 28, 2021 and February 16, 2022, Plaintiff does not allege that any retaliation by Gessner took place during that period. (SF ¶¶ 12, 14).

IV.    Proof at Trial

With respect to Plaintiff's case, the Court received direct testimony by affidavit from Plaintiff. After the Court received his affidavit into evidence, Plaintiff was called to the stand, beginning with Defendant's cross-examination of him and concluding with re-direct examination.

With respect to Defendant's case, the Court received direct testimony by affidavit from Sergeant Eric Colby ("Colby"), Morris, and Defendant. The Court received each of the witnesses' respective affidavits into evidence, and the parties were then permitted to elicit live testimony from these witnesses by way of cross-examination, re-direct examination, and re-cross examination.

What follows is a summary of the salient facts elicited from the witnesses and exhibits referenced and introduced at trial.[5]

A. Plaintiff's Proof

i. *Plaintiff Robert Pearson*

Plaintiff is an incarcerated individual who was housed at OCCF during the relevant time frame. (CE 1 ¶ 2). On June 1, 2022, Plaintiff was moved to the B-4 Housing Unit of OCCF ("B4" or the "B-4 Housing Unit"). (SF ¶ 20). While housed in B4, and on or about June 13, 2022, Plaintiff was approved for trustee status. (CE 1 ¶¶ 8, 9). OCCF permits certain inmates to work as trustees in the facility, as long as they are first approved for trustee status. (SF ¶ 19). At or around this same time, Plaintiff claims that non-party "Sergeant Nehrkorn," a corrections sergeant working in the same wing as Gessner, requested that Plaintiff be appointed to trustee status to work as a housing

---

[5] A majority of the exhibits were admitted prior to trial during a final pretrial conference held on November 5, 2025. (*See* Doc. 144). To the extent there were admitted exhibits listed in the Joint Pretrial Order which were not referred to at trial, provided in the parties' courtesy copy binder of exhibits, or cited in the parties' post-trial briefing, the Court has not considered them herein. *See, e.g., Sea Trade Mar. Corp. v. Coutsodontis*, No. 09-CV-00488, 2015 WL 4998638, at *4 (S.D.N.Y. Aug. 20, 2015) ("Judges are not like pigs, hunting for truffles buried in briefs or the record.").

unit trustee. (*Id.* ¶ 17; CE 1 ¶ 8; Tr. at 31:19-22).[6] Sergeant Nehrkorn submitted the Trustee Request form for Plaintiff's appointment to trustee status; and the Classifications Unit ("Classifications") approved this form at or around the same date. (SF ¶¶ 21, 22).

Between June 29, 2022 and August 22, 2022, Plaintiff was assigned to four housing unit trustee jobs in B4: 1) Housing Unit Cleaning Trustee; 2) Shower Detail Trustee; 3) Floor Detail Trustee; and 4) Paint Detail Trustee. (*Id.* ¶¶ 23-26; CE 1 ¶ 11). Specifically, on June 29, 2022, Gessner directed Morris to add Plaintiff to the B4 payroll for the Housing Unit Cleaning Trustee and Shower Detail trustee jobs, and Plaintiff was then added on July 1, 2022. (SF ¶ 23).[7] On July 20, 2022, Gessner assigned Plaintiff the role of Floor Detail trustee and Plaintiff started working in this role on July 29, 2022. (*Id.* ¶ 25). Finally, Gessner assigned Plaintiff to his fourth and final role, Paint Detail Trustee, on August 22, 2022, and Plaintiff began working in this role on August 26, 2022. (*Id.* ¶ 26). Plaintiff claims that Morris was responsible for overseeing the trustee program, and Gessner was only involved in assigning Plaintiff roles for the purpose of persuading him to drop the Underlying Lawsuit. (CE 1 ¶ 12; Tr. at 32:16-25).[8] The trustee positions were beneficial to Plaintiff's overall wellbeing and mental health, and Plaintiff performed all of his duties to the best of his ability without incident. (CE 1 ¶ 13).

---

[6] The Court cites to the transcript of proceedings held on January 27, 2026 as "Tr. ___."

[7] Plaintiff entered into evidence Exhibit 27, which contains an email thread between Morris and Nehrkorn, along with additional other email addresses, including Gessner. (Ex. 27). The subject of the email from Nehrkorn to Morris (with Gessner cc'd) states, "Only showers as a trial. Thank you" and Morris responds, "Pearson was Revoked on 12/28/21 for smoking in the yard. You still want him?" (*Id.*).

[8] The Parties stipulated that Gessner assigned and/or directed Morris to assign the four trustee jobs to Plaintiff. (SF ¶¶ 23-26). During cross-examination, however, and upon being questioned concerning whether Gessner was aware of the appeal of the Underlying Action, Plaintiff testified inconsistently, initially stating that Gessner was involved with the assignment of jobs only "verbally," then stating that Gessner "never gave [him] any jobs," before finally attempting to improperly "plead the Fifth." (Tr. at 32:16-36:3).

Gessner then removed Plaintiff from all four of his housing unit trustee positions between September 21, 2022 and October 6, 2022. (SF ¶¶ 27-30; *see also* CE 1 ¶¶ 15, 17, 20, 21). Plaintiff claims that after being removed from his Floor Detail Trustee position, he had a conversation with Gessner concerning his removal from his jobs; and Gessner stated that he removed Plaintiff because of the Underlying Action and because Plaintiff was "acting like a little girl" by suing him. (CE 1 ¶ 18). Plaintiff also claims he spoke with Gessner before being removed from his Paint Detail Trustee position, and Gessner told him, "you wanna cry like a little girl, matter fact, I'm taking your last job away." (Tr. at 72:1-73:7). Plaintiff testified that Gessner "mark[ed] [him] off with his red pen," and that's how he was aware that his last position was revoked. (*Id.*).[9]

Plaintiff testified that Gessner would call Plaintiff "princess" and "little girl" because he continued the pursuit of the appeal of the Underlying Action, and would call him these names "every time he entered the housing unit." (CE 1 ¶ 19). On or about October 9, 2022, Plaintiff was moved to the "D2" housing unit at OCCF ("D2" or the "D-2 Housing Unit"), with Gessner included as the "Requesting Officer" on the Inmate Housing Unit Relocation Form. (SF ¶ 31; Ex. 11). Plaintiff claims that Gessner facilitated that move because "he did not want me in his housing wing any longer," and again called Plaintiff a "little girl." (CE 1 ¶¶ 23-24). Plaintiff testified that he and Gessner had a conversation prior to Plaintiff's transfer to D2, in which he explained to Gessner that he could not go to D2 because "if I go over there, someone gonna get hurt . . .either I'm gonna get hurt or another inmate gonna get hurt," because Plaintiff had known issues with

---

[9] Plaintiff contested the implication that his being placed on One-to-One Suicide Watch was prior to his removal from the Paint Detail Trustee Position and thus the reason for his removal. (Tr. at 44:7-13). Upon being confronted with the Inmate Special Watch Form (Ex. 30), which has a time of "1825" on October 6, 2022, and an email with a time of 7:57 p.m. on October 6, 2022, detailing Gessner's email to Morris requesting that he remove Plaintiff due to his "being on a one-on-one" and "no longer qualified" (Ex. 18), Plaintiff became evasive and professed to not understand military time as he is "not in the military." (Tr. at 45:23-49:20).

other inmates in D2. (Tr. at 74:8-22). Plaintiff claims Gessner stated he did not care, and "that's what [Plaintiff] get[s] for filing bogus lawsuits." (*Id.*). Plaintiff, upon arriving at D2, was approached by another inmate who struck Plaintiff, and Plaintiff defended himself. (CE 1 ¶ 26; Ex. 28). Plaintiff claims that this particular inmate called him a "rat"[10] because Gessner and other officers had previously told inmates in D2 that Plaintiff was a rat or an informant. (*Id.*; Tr. at 75:3-10).[11]

After losing his trustee positions and upon transfer to D2, Plaintiff claims he attempted to submit a grievance form, but was denied one by Sergeant Nehrkorn and Sergeant Conroy. (CE 1 ¶ 28). Plaintiff also claims that multiple other members of the OCCF staff told him that his concerns could not be the subject of a grievance, and that Gessner was taking away his trustee positions in retaliation for continuing the appeal of the Underlying Lawsuit. (CE 1 ¶¶ 28, 29). Plaintiff testified that when he tried to file a grievance, he was told by "Grievance Coordinator Colby, Sgt. Colby, and other officers . . . of OCJ" that it was a non-grievable issue, and after asking for a grievance form he was denied one. (Tr. at 68:13-23). Plaintiff then stated that he actually "wrote a grievance from a regular piece of paper, put it in the grievance box, the grievance box was never filed," and as such, he "filed a grievance, but the jail never filed it." (*Id.* at 68:24-69:9).

---

[10] Exhibit 28 contains a video of the described incident between Plaintiff and another inmate upon Plaintiff's arrival at D2. The video does not contain sound, and upon careful review of the video, the Court is unable to determine whether any individuals in the video call Plaintiff a "rat" as Plaintiff testified. (*See* Ex. 28).

[11] Plaintiff appears to complain, in a June 5, 2022 letter, that Gessner was telling "the inmates in D2 that [Plaintiff] was a rat," and he was "in danger" because of it, yet in a July 29, 2022 letter, stated that he did not "have a problem with Sgt. Conroy or . . . Sgt. Gessner." (Ex. 20). Upon being questioned on cross-examination about this apparent about-face, Plaintiff testified that his July 29, 2022 letter had nothing to do with the June 5, 2022 letter, and in fact, was related to a "whole 'nother letter about a whole 'nother issue about inmates smoking in the . . . facility," and he didn't "mean that [he] didn't have a problem entirely with Sgt. Gessner." (Tr. at 54:9-62:4). Plaintiff then appeared to backtrack upon additional questioning from the Court, stating that "Sgt. Conroy came to me with a couple more of the officers and they asked me to sign off the grievances," as doing so would make his "problems go away," and they'd give him "another trust[ee] position or whatever . . .so that's the reason that I wrote the letter." (*Id.*).

7

B. Defendant's Proof

      i. Sergeant Eric Colby

Sergeant Eric Colby has been employed with the OCSO since June 23, 2001, and was promoted from the role of Corrections Officer to Sergeant on March 31, 2012. (CE 2 ¶¶ 2-3). Colby, in or about 2021, was assigned the role of Grievance Sergeant, which afforded Colby responsibility for overseeing the grievance process at OCCF including ensuring all grievances are properly investigated. (*Id.* ¶ 3; Tr. at 83:3-84:3). Colby retained this position until approximately July of 2023, and his current position is that of Union President. (Tr. at 83:3-18). Colby testified concerning OCCF's grievance policies, including as to the Inmate Handbook, Inmate Orientation, and the OCSO Grievance Policy. (CE 2 ¶¶ 4-6; Ex. 19; Ex. 39). Colby explained that while he was generally familiar with the policies, it had "been a while." (Tr. at 84:16-17). Colby, however, was able to explain that the OCCF grievance program mandates that following an attempt to resolve issues informally, an inmate must submit a written grievance within five days of the incident at issue. (CE 2 ¶ 7). Finally, Colby explained the appeal process of the grievance procedure, which culminates with an appeal to the New York State Commission of Correction (the "Commission"). (CE 2 ¶ 8). Colby clarified, however, that submission of a complaint directly to the Commission without following the proper grievance procedure steps would not be permitted by the Grievance Policy or "NYS Minimum Standards." (*Id.* ¶ 17).

On cross-examination, Colby distinguished between "complaints" and "grievances" clarifying that they are different things. Specifically, Colby testified that "complaints" are informal issues that do not require strict adherence to the grievance policy, while "grievances" are typically "on a grievance form" and follow the more formal grievance procedure. Though Colby would accept a grievance even if it was not written on the "facility-provided grievance form." (Tr. at

8

84:4-90:14; CE 2 ¶ 10; Ex. 39). When an inmate asks for a grievance form, the "facility-provided grievance form" is issued to them. (CE ¶ 10). Colby also explained that a grievance box is located in every housing unit, accessible to all inmates, and is checked daily, typically in the morning. (CE 2 ¶ 9; Tr. at 92:22-93:17). Colby testified in response to an inquiry by Plaintiff's counsel concerning the "vetting process," *i.e.*, "nobody goes through the box and says, oh, this isn't really a grievance and discards it," responding, "[n]o, sir." (Tr. at 93:18-21).

While the OCSO Grievance Policy (Ex. 39) details certain "[e]xclusions" that appear to include topics not subject to the grievance procedure, Colby testified that even if one of those exclusions may have applied, it was policy to still hand out the grievance form to the requesting inmate. (Tr. at 94:12-95:10). In other words, Colby clarified that despite the grievance policy exclusions and New York State minimum standard carve-outs, there are no inmate issues that are not subject to the grievance procedure. (*Id.* at 91:24-92:21, 93:24-94:9).

Colby testified that upon review of Plaintiff's grievance file and the 2022 Grievance Logbook, Plaintiff grieved two incidents, in or about May 25 and May 29, 2022, and no grievances were submitted by Plaintiff during the September through December 2022 time period. (CE 2 ¶¶ 12-15; Ex. 40; Ex. 45). According to Colby, the Grievance Logbook is used by the Sergeants to "record all grievances issued and submitted, each with a separate number allocated thereto," but would not include the documentation of informal "complaints." (CE 2 ¶ 15; Ex. 45; Tr. at 99:11-19).[12] Colby also testified that, at least as of May 2022, Plaintiff had the capability to submit a

---

[12] Colby testified on cross-examination concerning a "housing area logbook" in addition to the Grievance Logbook. (Tr. at 101:16-104:12). Colby explained that this "housing area logbook" does not in and of itself register a grievance, but would be used to log informal complaints, which, if unable to be resolved, would result in the issuance of a grievance. (*Id.*). The parties did not submit any "housing area logbook" into evidence, and Colby testified that he did not review anything but the Grievance Logbooks prior to his testimony. (*Id.* at 102:3-16).

9

grievance form at OCCF, based for example, on Plaintiff's submission of Grievance #22-0999. (Tr. at 98:11-99:6).

### ii.  Correction Officer Michael Morris

Correction Officer Michael Morris has been employed with the OCSO since October 26, 2002, and in January 2022 was assigned the role of trustee coordinator at OCCF, a role Morris holds to this day. (*Id.* at 105:14-106:5; CE 3 ¶¶ 2-3). The duties of the trustee coordinator are to oversee the day-to-day administration of the trustee program, which includes adding inmates to trustee payroll, and ensuring the program meets applicable administrative requirements including staying within an allotted budget. (CE 3 ¶ 3). Morris testified that he followed the Rules set forth in the OCSO General Policy – Trustee Selection Program (the "Trustee Policy"). (*Id.*; Ex. 13; Tr. at 106:6-18). For example, as to recommending an inmate for trustee status, a wing sergeant had the ability to recommend an inmate for housing unit trustee status. The process required the filling out of a form and sending it to Classifications. Classifications would then send the form back to Morris, either accepting or denying the recommendation by the endorsing sergeant. (Tr. at 110:3-25). Morris, at that time, would send the list of eligible inmates to Medical, who would send back a list of those cleared for housing unit trustee status. (*Id.* at 111:1-6). Morris would then assign such eligible inmates to trustee payroll and available jobs, upon, in certain situations, recommendations from the wing sergeants, including Gessner. (Tr. at 111:7-10; CE 3 ¶¶ 6-8).[13]

---

[13] Morris was asked on cross-examination about the procedure for removing a "housing unit trustee from his or her work assignment." (Tr. at 111:11-113:4). Initially, in response to questioning concerning a "sergeant need[ing] to request . . . removal from a lieutenant," Morris stated, "[t]o remove him from the job, yes. From working, totally, working take him off the trust[ee] program." (*Id.* at 111:24-112:4). Upon further questioning, however, including references to the Trustee Policy (Ex. 13), Morris appears to modify his interpretation, indicating that a "work assignment" "would be, like, a housing unit position," such as a "work detail" or "showers," and thus "according to [the Policy]" would necessitate a lieutenant's permission for removal. (Tr. at 132:6-134:6). Finally, in response to additional questioning by the Court concerning this issue, Morris explained that Gessner's removal of Plaintiff's four housing unit trustee roles did not

Morris understood that Gessner initiated the process for Plaintiff's trustee status through a Trustee Request Form dated June 13, 2022, despite Plaintiff's history of "disruptive and dangerous behavior," in order to "further a rehabilitative effort." (CE 3 ¶ 5). On June 29, 2022, Morris was directed by Gessner to add Plaintiff to two jobs: Housing Unit Cleaning Trustee and Shower Detail Trustee. (*Id.* ¶ 6; Ex. 6; Ex. 16). On July 20, 2022, Morris was directed by Gessner to add an additional Floor Detail Trustee position for Plaintiff (CE 3 ¶ 7; Ex. 7), and then on August 22, 2022, Gessner directed Morris to add Plaintiff to a fourth job of Paint Detail Trustee (CE 3 ¶ 8; Ex. 8).

Morris explained that he had a "budgetary goal" for each pay period that was to keep the trustee payroll amount between $1,800 and $2,000. (CE 3 ¶ 4). This $2,000 cap, while not included in the Trustee Policy, was instead a direct order verbally stated during a 2021 administration meeting that he and his supervisor attended along with other individuals. (Tr. at 113:6-114:4, 115:6-8). At that time, Morris was not yet the trustee coordinator, (*id.* at 114:5-7), but testified that he was asked to come to the meeting because he "assum[ed] [he] was the next to get the . . . trust[ee] coordinator position" (*id.* at 140:7-13). Since the 2021 meeting, Morris was never again notified about any budget, generally, or specifically relating to a $2,000 cap, but testified in the affirmative in response to questioning whether he would continue to keep a "standing order" from administration until told otherwise. (*Id.* at 142:6-143:1). The Trustee Program Payroll list details the amount being paid to trustees on a weekly basis. (CE 3 ¶ 9; Ex. 17). On the week between September 10 and September 16, 2022, Morris noticed that the amount paid to trustees was over $2,000, specifically, $2,059. (CE 3 ¶ 9). Accordingly, Morris verbally alerted the Sergeants for

---

need approval from the lieutenant, as that approval was only needed to take away the overarching "status" of housing unit trustee. (Tr. at 127:2-128:58).

each housing unit to "work on reducing the number of trustees being paid out, if possible." (*Id.*; Tr. at 116:2-10, 118:4-19). Morris could not recall whether he e-mailed the Sergeants, whether the verbal notification was over the phone or otherwise, or which specific Sergeants he alerted, aside from Gessner. (Tr. at 116:11-118:1).

Morris claims that between September 21, 2022 and October 2, 2022, Gessner responded to his request by merging the duties of certain trustee positions in order to eliminate others. (CE 3 ¶ 11). For example, Gessner eliminated Shower Detail Trustee and Floor Detail Trustee positions and merged such duties into the overarching Housing Unit Cleaning Trustee position. (*Id.* ¶¶ 11, 13; Ex. 9; Ex. 10; Ex. 15). Specifically relevant here, Gessner eliminated Plaintiff's Shower Detail Trustee position on September 21, 2022, and eliminated Plaintiff's Floor Detail Trustee position on September 24, 2022. (CE 3 ¶¶ 11, 13; Ex. 9; Ex. 10). Subsequently, on October 2, 2022, Gessner then eliminated the remaining Floor Detail Trustee position held by another inmate, as well as Plaintiff's Housing Unit Cleaning Trustee position. (CE 3 ¶ 15; Ex. 15). Finally, on October 6, 2022, Gessner notified Morris to remove Plaintiff from his fourth and final trustee position, the Paint Detail Trustee position, as Plaintiff had been placed on "One-to-One Suicide Watch status." (CE 3 ¶ 16; Ex. 18). Morris testified that this constituted an emergency situation at OCCF and is a reason to remove an inmate from trustee status. (Tr. at 138:17-25).

### iii.   Defendant Nicholas Gessner

Gessner is currently a lieutenant at OCCF, and was promoted to such position on April 26, 2025. (CE 4 ¶ 2). Gessner, prior to his promotion, was a Sergeant, and held this position during the entire time frame relating to the allegations in this matter. (*Id.* ¶ 3). As Sergeant, Gessner's duties included overseeing the Bravo Wing Housing Units, including B4, daily during the 7-3 shift; and he began this assignment at or around the beginning half of 2022. (*Id.* ¶ 9). At the time that

12

Gessner was assigned to oversight of B4, he was already familiar with Plaintiff based upon previous instances of misbehavior that he had personally encountered as well as Plaintiff's extensive disciplinary history at OCCF. (*Id.*; Ex. 42).

Gessner was aware that Plaintiff filed the Underlying Lawsuit as of September 24, 2021, after requesting and receiving legal defense and indemnification from the Orange County Attorney's office. (CE ¶ 4; Tr. at 151:6-24). Gessner then received notice from his counsel on May 13, 2022 that such lawsuit was dismissed. (CE 4 ¶ 6; Ex. 41; Tr. at 152:3-20). Gessner claims that he did not know that Plaintiff filed a Notice of Appeal of the dismissal on May 31, 2022, as his counsel did not inform him about the appeal. (CE 4 ¶ 8; Tr. at 152:8-153:10).

When Gessner first became Sergeant for B4, he noticed that Plaintiff had been exhibiting signs of positive behavioral changes. (CE 4 ¶ 10). Gessner therefore thought it would be beneficial to Plaintiff to see if he would be interested in a trustee position, because in Gessner's experience trustee jobs provide positive benefits to inmates' mental health and behavior. (*Id.*). Gessner also thought that these trustee positions could help Plaintiff work off some of the debt he had built up through his past disciplinary infractions. (*Id.* ¶ 11; Ex. 12; Tr. at 169:2-10). Plaintiff, however, needed an override in order to be eligible for trustee status, due to his previous misbehavior and discipline record. (CE 4 ¶ 12). Gessner therefore confirmed, through staff, that Plaintiff was interested in a trustee position, and obtained a verbal override for approval of Plaintiff's trustee status from a Captain, then notified Classifications verbally of same. (CE 4 ¶ 12; Tr. at 156:4-23). Gessner is not aware of any written communications that would demonstrate this override as described. (Tr. at 156:21-23). Gessner, however, did not fill out the Trustee Request Form for Plaintiff, as Sergeant Nehrkorn's name was listed as the Requesting Officer on Plaintiff's form. (SF ¶ 21; Ex. 5). Gessner did not recall specifically speaking with Sergeant Nehrkorn about

13

Plaintiff and this Trustee Request Form, but testified that he would generally discuss the trustees in the wing with Sergeant Nehrkorn as they both had to "be on the same page." (Tr. at 154:18-155:7). Classifications granted Plaintiff trustee status on June 13, 2022, upon submission and approval of the Trustee Request Form. (SF ¶¶ 21-22).

Thereafter, between June 29, 2022 and August 22, 2022, Gessner directed Morris to add Plaintiff to four trustee roles, including first assigning Plaintiff to Housing Unit Cleaning Trustee and Shower Detail Trustee roles, then adding Plaintiff as Floor Detail Trustee, and then finally Paint Detail Trustee. (*Id.* ¶¶ 23-26; CE 4 ¶¶ 15-17). Gessner testified that he kept adding Plaintiff to more roles due to his continued satisfactory performance, and as they seemed to be having a "positive effect" upon Plaintiff. (CE 4 ¶¶ 16-17; Tr. at 157:10-158:14). Gessner did not observe any disciplinary issues with Plaintiff during this time. (Tr. at 157:21-158:1).

On or about the middle of September 2022, Morris alerted Gessner verbally that he was over the trustee budget for trustee payouts. (CE 4 ¶ 18; Tr. at 158:15-159:12). Morris did not, however, tell Gessner what the actual budget was, what amount over the budget the payroll was, or specifically how many trustee positions needed to be eliminated to assist. (Tr. at 159:16-160:3). Nevertheless, Gessner attempted to assist with the budgetary issue by consolidating and eliminating certain trustee positions, including those held by Plaintiff. Specifically, on September 21, 2022, September 24, 2022, and October 2, 2022, Gessner's budgetary modifications resulted in Pearson being removed from three out of the four of his trustee roles, including: the Shower Detail Trustee role (September 21, 2022 – eliminated and consolidated into the Housing Unit Cleaning Trustee role); Floor Detail Trustee role (September 24, 2022 - eliminated and consolidated into the Housing Unit Cleaning Trustee role); and Housing Unit Cleaning Trustee role (October 2, 2022 – removed as Gessner claimed that Plaintiff would retain the Paint Detail

14

Trustee role since it was separate from cleaning details and would not be consolidated). (CE 4 ¶¶ 18-20). Other inmate roles were modified/consolidated as well. (*Id.*; *see also* Exs. 9, 10, 15, 16). Gessner stated that he did not recall whether he had any additional conversations with Morris about the budgetary concerns besides the one occurrence in mid-September 2022, and prior to this conversation, Gessner had never previously consolidated or removed positions for budgetary reasons. (Tr. at 160:7-162:14). Based on Gessner's interpretation of the Trustee Policy and the term "work assignment," lieutenant approval was only necessary when removing an inmate from trustee status, *i.e.*, an inmate's "work assignment," as opposed to lieutenant approval being necessary any time an inmate's job, such as a Floor Detail Trustee position, was removed. (Tr. at 170:21-172:22).

After removing Plaintiff from his Housing Unit Cleaning Trustee role, Gessner spoke with Plaintiff and told him that he was removing his positions for budgetary reasons. (CE 4 ¶ 21; Tr. at 168:16-170:1). According to Gessner, Plaintiff then became "irate and nonsensical." (CE 4 ¶ 21). Gessner claims that at no point did he ever tell Plaintiff that he was removing him from trustee roles because of the pending Underlying Lawsuit, and Gessner testified that the Underlying Lawsuit was not a consideration in the decision to remove Plaintiff from his roles. (*Id.* ¶ 24; Tr. at 189:9-13).

On October 6, 2022, Plaintiff was placed on One-to-One Suicide Watch, which necessarily resulted in Gessner directing Morris to remove Plaintiff's Paint Detail Trustee position, as Plaintiff would be unable to leave his cell and therefore could not complete his trustee role. (CE 4 ¶¶ 22-23; Ex. 30; Ex. 18; Tr. at 170:2-9). On the same date, October 6, 2022, Plaintiff was moved to Medical-1 Housing Unit, as he was placed in contact isolation per medical staff directives. (CE 4 ¶¶ 25-26; Ex. 29; Ex. 31; Ex. 32). Plaintiff was subsequently removed entirely from suicide watch

15

as of October 8, 2022, and moved from the Medical-1 Housing Unit to the B-1 Housing Unit, which is a temporary unit. (CE 4 ¶¶ 27-28). Plaintiff was then found with contraband in his cell in the B-1 Housing Unit on October 8, 2022, specifically, "metal pieces that [Plaintiff] w[as] hiding in a kosher meal bag." (*Id.* ¶ 29; Tr. at 52:5-14). On October 9, 2022, Plaintiff was cleared from contact isolation, and was moved to a permanent unit, specifically, the maximum-security unit of OCCF identified as the D-2 Housing Unit. (CE 4 ¶¶ 30-31; Ex. 11; Ex. 36; Ex. 37). Gessner claims that while wing sergeants can submit an Inmate Housing Unit Relocation Form to Classifications, the Classifications Unit makes the ultimate determination as to which housing unit to move the inmate in question. (CE 4 ¶¶ 32-33; Tr. at 174:7-175:22). Accordingly, in this instance, Gessner testified that while he put in the request for Plaintiff to be moved out of the B-1 Housing Unit, Classifications filled out the form itself and submitted it back to him for his signature, after they completed review of the necessary factors to determine where Plaintiff could properly be sent. (CE 4 ¶ 32; Tr. at 174:18-22).

At or around the time of Plaintiff's relocation from the B-1 Housing Unit to the D-2 Housing Unit, Plaintiff spoke with Gessner and told Gessner that he feared for his life in the D-2 Housing Unit. (Tr. at 178:19-179:3). On October 9, 2022, however, Plaintiff did not have anything in his file to suggest that he should not be housed with any particular inmates at that time, including those in the D-2 Housing Unit, identified by the absence of any "keep-separate" orders. (CE 4 ¶¶ 34-36; Ex. 38; Tr. at 191:13-192:9). While Gessner had the ability to request an override to stop Plaintiff from being transferred to the D-2 Housing Unit, subject to approval by the "shift commander," Gessner chose not to, as "there was no reason to," because according to "Classifications, there was no issue between [Plaintiff] and any inmate in [the D-2 Housing Unit]." (Tr. at 179:12-180:13).

16

Gessner testified that at no time did he call Plaintiff a "little girl" or a "princess," or ever suggest to any other inmates that Plaintiff was a "rat." (CE 4 ¶¶ 36, 40; Tr. at 189:14-190:1). Gessner also claims that his initiation of the housing relocation request to Classifications had nothing to do with the Underlying Lawsuit or Plaintiff's appeal therefrom, but rather was due to Plaintiff needing to be moved out the temporary intake B-1 Housing Unit. (CE 4 ¶¶ 29-31, 38).

## STANDARD OF REVIEW

I.    Plaintiff's Claim

Plaintiff's first and only claim for relief against Defendant alleges retaliation in violation of the First Amendment, brought pursuant to 42 U.S.C. § 1983. (Doc. 1). Plaintiff bears the burden of proving his claim by a preponderance of the evidence, and "it is within the province of the district court as the trier of fact to decide which testimony should be credited." *See MSC Mediterranean Shipping Co. S.A. v. Airlift Marine Servs. PVT Ltd.*, 579 F. Supp. 3d 484, 488 (S.D.N.Y. 2022).

A.    First Amendment Retaliation

"[T]o sustain a First Amendment retaliation claim, a prisoner must demonstrate the following: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and (3) that there was a causal connection between the protected speech and the adverse action." *Randle v. Alexander*, No. 10-CV-09235, 2011 WL 1226228, at *2 (S.D.N.Y. Mar. 22, 2011) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)). "Courts must approach prisoner retaliation claims with 'skepticism and particular care[] because virtually any adverse action taken against a prisoner by a prison official . . . can be characterized as a

17

constitutionally proscribed retaliatory act.'" *Walker v. Senecal*, 130 F.4th 291, 298 (2d Cir. 2025).[14]

An action may be "adverse" when it "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Connelly v. County of Rockland*, 61 F.4th 322, 325 (2d Cir. 2023). Conduct short of this standard is "simply *de minimis* and . . . outside the ambit of constitutional protection." *Ruggiero v. Cnty. of Orange*, No. 19-CV-03632, 2020 WL 5096032, at *7 (S.D.N.Y. Aug. 28, 2020). Further, for there to be a "causal connection," the "allegations must support an inference that the protected conduct was 'a substantial or motivating factor for the adverse actions taken by prison officials.'" *Dorsey v. Fisher*, 468 F. App'x 25, 27 (2d Cir. 2012). That being said, a retaliation claim will lie even where "the measures taken by defendants were otherwise justified," so long as plaintiff can prove that retaliation was a "motivating factor." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014).

Finally, even if Plaintiff can show a *prima facie* retaliation claim, and the record evidence "permits a reasonable inference that Plaintiff's protected activity was a motivating factor in the challenged decision," a defendant may still avoid liability if it can show by a preponderance of the evidence that the decision would have been made regardless of the protected conduct, *i.e.*, that "it would have taken the same action in the absence of the impermissible reason." *Tolliver v. Jordan*, No. 19-CV-11823, 2023 WL 2664325, at *6 (S.D.N.Y. Mar. 28, 2023); *see also Anemone v. Metro. Trans. Auth.*, 629 F.3d 97, 115 (2d Cir. 2011).

---

[14] As to the first prong, the parties have stipulated that "[f]iling and prosecuting a lawsuit is speech or conduct protected by the First Amendment." (JPTO at 5). As such, the Court accepts Plaintiff's filing of the Underlying Lawsuit as "speech or conduct protected by the First Amendment" and the first prong of the analysis is therefore satisfied.

18

II.      Defendant's Affirmative Defense

Defendant posits that Plaintiff failed to exhaust his administrative remedies prior to commencement of the instant lawsuit, in violation of the PLRA. (JPTO at 2).[15] Defendant must carry its burden to prove affirmative defenses by a preponderance of the evidence, including the "burden of proving plaintiff's failure to comply with the [PLRA] exhaustion requirement." *Arnold v. Goetz*, 245 F. Supp. 2d 527, 534-35 (S.D.N.Y. 2003).

A.  PLRA Administrative Exhaustion

The Prison Litigation Reform Act ("PLRA") states that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies are exhausted." 42 U.S.C. § 1997e(a). This provision "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes," *Hernández v. Coffey*, 582 F.3d 303, 305 (2d Cir. 2009) (quoting *Porter v. Nussle*, 534 U.S. 516, 532 (2002)); and it is "'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies," *Ross v. Blake*, 578 U.S. 632, 638 (2016) (citation omitted). Moreover, the PLRA requires "proper exhaustion" which means "using all steps that the prison grievance system holds out." *Caraballo v. Pliler*, No. 21-CV-10476, 2023 WL 3467185, at *5 (S.D.N.Y. May 15, 2023). Specifically, "complete exhaustion to the highest level is required for each claim." *Singh v. Goord*, 520 F. Supp. 2d 487, 495 (S.D.N.Y. 2007).

The PLRA's mandatory exhaustion requirement is excused when the administrative remedies are unavailable to the inmate, or where "officials prevented him from utilizing a

---

[15] As detailed *infra*, the Court need not, and does not, reach Defendant's qualified immunity affirmative defense. (*See infra* at 31).

grievance procedure." *Arnold*, 245 F. Supp. 2d at 537; *see also Ross*, 578 U.S. at 642-45 ("interference with an inmate's pursuit of relief renders the administrative process unavailable"). Complete exhaustion must be done "prior to commencing suit," as it is insufficient to "take only limited steps toward exhaustion before commencing suit, or even to exhaust a claim entirely during the pendency of the case." *Schwartz v. Dennison*, 518 F. Supp. 2d 560, 568 (S.D.N.Y. 2007).

## ANALYSIS

### I.    Plaintiff Fails to Establish a *Prima Facie* Case

Plaintiff has the burden to establish by a preponderance of evidence each of the elements of his First Amendment retaliation claim. *See MSC Mediterranean Shipping Co. S.A.*, 579 F. Supp. at 488. In short, the Court found Gessner's, Morris's, and Colby's testimony credible, as such testimony was corroborated by additional uncontroverted evidence. Whereas Plaintiff's testimony suffered from a lack of credibility and/or an utter failure of proof in connection with the elements of his claim. Plaintiff's testimony was rank with inconsistencies, apparent missteps, attempted backtracks as well as plain on-the-spot and new explanations that convinced the Court that his testimony was made up and far afield from any semblance of truth. Equally, almost none of it was corroborated. In other instances, Plaintiff attempted to offer a mosaic of circumstantial proof that ultimately hinged on Plaintiff's credibility; and in this case, the mosaic failed. The Court has carefully reviewed the evidence, including the documentary and testimonial evidence concerning each of the adverse actions, along with the causal relationship between each; and the timeline of the filing, dismissal, and appeal of the Underlying Action, including Gessner's knowledge thereof. Upon review, the Court concludes that Plaintiff has failed to establish his First Amendment retaliation claim against Gessner by a preponderance of the evidence. *See id.*

A. <u>Adverse Actions</u>

Plaintiff posits the following alleged adverse actions: i) Gessner calling Plaintiff names, such as "little girl" and "princess"; ii) Gessner's revocation of Plaintiff's four trustee positions; and iii) Gessner's transfer of Plaintiff from the B-4 Housing Unit to the D-2 Housing Unit, which allegedly posed a risk of harm to Plaintiff. (Doc. 154 at Plaintiff's Proposed Findings of Fact ¶¶ 15, 17, 21, 22; Doc. 154 at Plaintiff's Proposed Conclusions of Law ¶ 28). The Court analyzes each *seriatim*.

### i. Name-calling

As an initial matter, the only evidence that Gessner ever called Plaintiff a "princess" or "little girl" is based on Plaintiff's say-so. (*See* CE 1 ¶¶ 18, 19, 23, 24; Tr. at 72:1-73:7). Gessner, on the other hand, represented that he never called Plaintiff either of those names. (*See* CE 4 ¶ 36, 40; Tr. at 189:14-190:1). On cross-examination, Plaintiff testified that "*every time* [Gessner] entered the housing unit," Gessner would call him a "princess" or "little girl." (CE 1 ¶ 19). Plaintiff's testimony is uncorroborated and unbelievable. Further, Plaintiff's description of a conversation he had with Gessner prior to being removed from the Paint Detail Trustee position, when Gessner allegedly took away his last role for "cry[ing] like a little girl," is not plausible nor supported by any documentary evidence. Plaintiff's last job was removed due to being placed on one-to-one suicide watch, yet, when confronted with documentary evidence indicating such, Plaintiff's responses were evasive, edgy, and he became non-cooperative and untruthful. (*See* Tr. at 45:23-49:20 (Plaintiff attempted to avoid the implications of the Inmate Special Watch Form by claiming he does not understand military time, and doubling down on his testimony that the Paint Detail Trustee role was removed before he was put on suicide watch, despite plain evidence to the contrary.)). Similarly, Plaintiff's testimony concerning name-calling is equally unreliable, and the

21

Court affords it no weight. Accordingly, comparing the testimony of these two witnesses, the Court, as the "trier of fact," credits and relies upon Gessner's testimony, as Plaintiff's demeanor and evasiveness throughout the trial smacked of falsity.

In any event, even if the Court were to find Plaintiff's testimony credible, as a matter of law, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003). Here, Gessner's utilizing "insulting or disrespectful" or even "sarcastic" comments, such as calling Plaintiff a "princess" or "little girl," are "*de minimis*" and therefore cannot constitute an adverse action. *Id.*; *see also Ross v. Westchester Cnty. Jail*, No. 10-CV-03937, 2012 WL 86467, at *7 (S.D.N.Y. Jan. 11, 2012) ("Non-specific verbal threats, harassing comments and hostile behavior do not constitute adverse actions sufficient to state a retaliation claim."). Accordingly, Plaintiff's retaliation claim based on name-calling must fail.

### ii. Revocation of Trustee Positions

Termination of a prisoner's employment may, as a matter of law, constitute an adverse action for purposes of a First Amendment retaliation claim. *See Baker v. Zlochowon*, 741 F. Supp. 436, 439 (S.D.N.Y. 1990); *see also Moorer v. McCann*, No. 23-CV-06040, 2023 WL 12052536, at *4 (W.D.N.Y. Apr. 4, 2023). As the Parties have stipulated to the fact that Plaintiff's four trustee roles were terminated, and that Gessner was involved in directing the termination of each of the four roles, at least in some capacity, the Court finds that Plaintiff has sufficiently shown such revocations of the trustee positions to be an adverse action. (SF ¶¶ 27-30).

### iii.   Transfer to an Unsafe Housing Unit

It is well-settled that prison officials have "broad discretion to transfer prisoners and they may do so for any reason or no reason at all." *Lovett v. Bennett*, No. 22-CV-05462, 2024 WL 643207, at *5 (S.D.N.Y. Feb. 15, 2024). However, transfers may not occur "solely in retaliation for the exercise of constitutional rights." *Meriwether v. Coughlin*, 879 F. 2d 1037, 1046 (2d Cir. 1989). In other words, the proper inquiry is whether "the transfer, which may otherwise not rise to the level of a constitutional violation, would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Arriaga v. Annucci*, No. 23-CV-01941, 2024 WL 1743300, at *11 (S.D.N.Y. Apr. 23, 2024).

Here, it is uncontroverted that Plaintiff feared for his safety in the D-2 Housing Unit, as both Plaintiff and Gessner testified to a conversation concerning this topic. (Tr. at 74:8-22, 178:19-179:3). Therefore, on its face, it would appear that Plaintiff's transfer from the B-1 Housing Unit to the D-2 Housing Unit could constitute an adverse action. *See Lovett*, 2024 WL 643207, at *5 (holding that a "transfer which was solely motivated for the purpose of placing an inmate's life in danger can constitute adverse action"). The more pertinent issue here, however, is whether Gessner was directly involved in Plaintiff's transfer to the D-2 Housing Unit. *See Tolliver*, 2023 WL 2664325, at *5-6 (finding that the "record is devoid of evidence that . . . [Defendants] even had any authority for his transfer").

The evidence shows that on or about October 9, 2022, Plaintiff was moved to the D-2 Housing Unit at OCCF, and the Inmate Housing Unit Relocation Form was signed by Gessner as the "Requesting Officer." (SF ¶ 31; Ex. 11). Gessner, however, testified that while he did issue the request, which was submitted to Classifications, he did not make the ultimate determination as to which housing unit Plaintiff was moved. (Tr. at 174:17-175:22). Instead, Classifications conducted

an analysis of Plaintiff and the relevant factors and then filled out the Inmate Housing Unit Relocation Form for submission back to Gessner. (*Id.* at 174: 18-22). Upon receipt, Gessner testified that he simply signed off on the form. (*Id.*). While Gessner avers that he "alone do[es] not make the decision to relocate an inmate," as the form "must be reviewed and approved by the Classification Officer and Shift Commander," Gessner's affidavit can also be read to imply that in the initial submission of the Inmate Housing Unit Relocation Form, he may "propose[]" a unit for transfer. (CE 4 ¶ 32 ("many factors are considered, such as whether the inmate has any no contacts on file with other inmates in the *proposed unit*") (emphasis added)). Accordingly, it is less than crystal clear what role, exactly, Gessner had in moving Plaintiff, but what is clear is that he maintained some level of responsibility for Plaintiff's transfer.

Therefore, in light of the evidence at hand concerning Plaintiff's transfer, including both Gessner's involvement, as well as Plaintiff's uncontroverted distress of being moved to the D-2 Housing Unit, the Court finds that the transfer constitutes an adverse action for purposes of Plaintiff's First Amendment retaliation claim.

### B. Causal Connection

Plaintiff, to sufficiently satisfy his burden on the third element of the First Amendment retaliation claim, must demonstrate a causal link between his protected activity—the filing of the Underlying Lawsuit and subsequent appeal—and i) the termination of Plaintiff's trustee roles; or ii) Plaintiff's transfer to the D-2 Housing Unit. In short, Plaintiff's allegations "must support an inference that the protected conduct was 'a substantial or motivating factor for the adverse actions taken by prison officials.'" *Dorsey*, 468 F. App'x at 27 (quoting *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003)).

24

> *i.  Revocation of Trustee Positions and Transfer to the D-2 Housing Unit*

The record evidence shows that Plaintiff filed the Underlying Action on June 28, 2021, and amended the complaint in that action to include Gessner as a defendant on September 7, 2021. (SF ¶¶ 3, 4). Gessner was aware of the Underlying Action as of September 24, 2021 (SF ¶ 6; Ex. 4) and was notified by his counsel of the dismissal of the Underlying Action a day after the action was dismissed, on May 14, 2022. (SF ¶ 8). Gessner claims that because of the dismissal, he was under the impression that there was no pending lawsuit against him as of May 14, 2022. (CE 4 ¶ 7). While it is stipulated that Plaintiff appealed the dismissal of the Underlying Action on May 31, 2022, and that Plaintiff was actively pursuing the appeal at least through August 2022 (*id.* ¶ 9; *see also* Ex. 50), Gessner claims that he was not aware that Plaintiff filed an appeal, as his counsel never informed him about the appeal (Tr. at 152:21-153:10; CE 4 ¶ 8). Gessner testified that he "absolutely" did not revoke Plaintiff's trustee positions in retaliation for the Underlying Lawsuit (Tr. at 189:9-13); and that the Underlying Lawsuit neither had any "impact on [his] decision to initiate a housing relocation request for [Plaintiff] to the D-2 Housing Unit nor was the lawsuit a consideration . . . in making that request." (CE 4 ¶ 38).

The only direct evidence proffered by Plaintiff of causation is Plaintiff's own testimony. Specifically, as to Gessner's knowledge of the protected activity, Plaintiff posits that the Court should rely upon Plaintiff's affidavit and testimony at trial as direct evidence of Gessner's retaliation. However, the Court finds that Plaintiff's testimony is not credible and cannot be relied upon. Plaintiff, throughout his testimony, was evasive, on edge, noncooperative and untruthful, consistently modifying his answers to avoid implications of the line of questioning, as he saw fit. Specifically, upon being questioned concerning whether Gessner was aware of the appeal of the Underlying Action, Plaintiff initially testified that Gessner was aware of the appeal in June 2022,

because Gessner "came to [Plaintiff] and told [him] . . . he was going to see . . . about getting [Plaintiff] some trust[ee] positions so [Gessner] could drop the excessive lawsuit against him." (Tr. at 32:12-33:4). Plaintiff, however, then changed his testimony, testifying that it was "not correct" that Gessner "knew the appeal was pending [while] [Plaintiff] w[as] actively pursuing the appeal, but he was still giving [Plaintiff] these jobs regardless." (Tr. at 33:5-35:10). Plaintiff then changed his tune again and stated that Gessner was involved with the assignment of jobs only "verbally," that Gessner "never gave [him] any jobs," and then finally attempted to improperly "plead the Fifth." (Tr. at 32:16-36:3).

Plaintiff would have the Court rely upon circumstantial evidence and make the inference that since Gessner was informed by counsel about the dismissal of the Underlying Action, that he then also would have been notified of the appeal. (Pl. Br. at 4-5). Plaintiff even suggests the Court should take this inference a step further, stating that "logically the earliest [Gessner's] attorney would have notified Gessner about the appeal" would have been June 22, 2022, the date Gessner's counsel entered an appearance in the appeal. (Pl. Br. at 5; Ex. 50). The Court declines to make these inferences. It is Plaintiff's burden of proof to show a causal connection between the protected conduct and the adverse actions. The Court, as the "trier of fact," credits and relies upon Gessner's testimony that he had no knowledge of the appeal, and in any event, neither terminated Plaintiff from his trustee positions nor transferred Plaintiff to the D-2 Housing Unit in retaliation for Plaintiff filing the Underlying Lawsuit or appeal. (Tr. at 189:9-13, CE 4 ¶ 38).

Even if the Court were to give credence to such an inference, which it is not inclined to do, this timeline nevertheless does not make logical sense. Specifically, as to the revocation of trustee positions, it is not reasonable that Gessner would, upon notice of the appeal on June 22, 2022, turn around and recommend Plaintiff to four trustee positions between the time period of June 29, 2022,

26

and August 22, 2022. It is even less believable that only a mere month later Gessner would begin to remove Plaintiff from all of these jobs, spanning between September 21, 2022 and October 6, 2022, in retaliation for the appeal that Gessner allegedly knew about prior to his recommendations. (*See* SF ¶¶ 23-30).[16] Further, the Court finds credible Gessner's testimony that he recommended Plaintiff to the trustee positions because in his experience such jobs "reflect[ ] positively on [inmates'] mental health and behavior," and Gessner thought they would help Plaintiff pay off disciplinary tickets. (CE 4 ¶ 10; Tr. at 157:17-20, 192:13-193:3; Ex. 12).

Similarly, as to Plaintiff's transfer to the D-2 Housing Unit, Plaintiff has failed to sufficiently carry his burden to show a causal connection between the Underlying Lawsuit and/or appeal and the transfer. In sum, the record is devoid of credible evidence that Gessner had knowledge of the appeal when he initiated Plaintiff's transfer. Plaintiff would have the Court believe that during a conversation with Gessner prior to his transfer, Gessner told Plaintiff that he did not care about Plaintiff's safety, and the transfer to the D-2 Housing Unit was what Plaintiff "get[s] for filing bogus lawsuits." (Tr. at 74:8-22). While Gessner acknowledges that he and Plaintiff did have a conversation wherein Plaintiff told Gessner that he feared for his life in the D-2 Housing Unit, there is no indication that Gessner initiated that transfer because of the Underlying Lawsuit, and it is not clear whether Gessner himself even proposed the D-2 Housing Unit to

---

[16] Plaintiff also attempts to inject an additional piece of circumstantial evidence to show a causal connection: namely, that certain of Plaintiff's filings to the appeal docket were temporally related to Plaintiff losing his four trustee positions. (*See* Pl. Br. at 3-5; Ex. 50). The Court acknowledges that "generally, temporal proximity is strong circumstantial evidence of improper intent." *See Raymond v. City of New York*, 317 F. Supp. 3d 746, 773 (S.D.N.Y. 2018). Here, however, it is undisputed that Gessner was aware of the Underlying Lawsuit since September 24, 2021 (SF ¶ 6), yet there are no allegations of retaliation by Gessner against Plaintiff during the entire time period the Underlying Lawsuit was active prior to its dismissal and appeal. Notably, this included a four-month period when Plaintiff was incarcerated in OCCF during October 2021 through February 2022. (SF ¶ 12). In light of these facts, and considering Gessner's credible testimony, the Court does not afford any weight to the temporal proximity of filings in the appeal as circumstantial evidence.

Classifications. (*See* CE 4 ¶ 32). Further, it is black-letter law that a plaintiff "may not rely on conclusory assertions of retaliatory motive to satisfy the causal link," which is exactly what Plaintiff attempts to do here. *Raymond*, 317 F. Supp. 3d at 773. Thus, as it is Plaintiff's burden to show by a preponderance of the evidence that the transfer was causally related to the Underlying Lawsuit or appeal, the record "does not support a reasonable finding that the decision [to transfer Plaintiff] was born of animus against his protected activity." *Sheika v. Levesque*, No. 06-CV-01876, 2011 WL 3930272, at *4 (D. Conn. Apr. 21, 2011).

Accordingly, because Plaintiff has failed to marshal sufficient evidence demonstrating the requisite element of causation to sufficiently carry his burden of proof, he has not established a *prima facie* case as to his First Amendment retaliation claim.[17]

## II. Defendant's Affirmative Defenses

Even if Plaintiff had sufficiently established a *prima facie* case for First Amendment retaliation—which he has not—Defendant has established his affirmative defense of Plaintiff's failure of administrative exhaustion under the PLRA.

---

[17] Assuming *arguendo* that Plaintiff did establish a *prima facie* case of retaliation, the Court nevertheless finds that Defendant has sufficiently proven by a preponderance of the evidence that "even in the absence of the protected conduct," Gessner would have removed Plaintiff's positions, based on budgetary reasons or due to Plaintiff's being placed on a one-to-one suicide watch, and he would have recommended Plaintiff be transferred out of the B-1 Housing Unit. *Nicholas v. Tucker*, 89 F. Supp. 2d 475, 479 (S.D.N.Y. 2000). The Court credits and accepts these conclusions based on the credible testimony of Gessner and Morris, coupled with both the documentary evidence of emails between the two concerning moving jobs around for "budget" reasons (CE 3 ¶¶ 4, 9; CE 4 ¶¶ 18-24; Tr. at 113:6-114:4, 115:6-8, 116:2-10, 118:4-19, 158:15-159:12, 159:16-160:3, 168:16-170:1; Exs. 9, 10, 15, 16), and the documentary evidence of Plaintiff's "Inmate Special Watch Form" and associated documents detailing the medical designation as a result of Plaintiff's stating he was "actively suicidal" (Exs. 18, 30-33). Additionally, as to Plaintiff's transfer to the D-2 Housing Unit, the Court credits Gessner's testimony and documentary evidence concerning Plaintiff being found with contraband and needing to be moved from the temporary B-1 Housing Unit and be housed in a unit that allows for maximum security classification. (CE 4 ¶¶ 31-32; Exs. 11, 37; Tr. at 52:5-14). The Court notes that while the B-4 Housing Unit is known as the mental health housing unit, it can allow for inmates with maximum security status, as Plaintiff was while in B4. (Tr. at 52:22-53:14). That being said, and as both Plaintiff and Gessner testified, the D-2 Housing Unit is the maximum security housing unit at OCCF. (Tr. at 53:12-14; CE 4 ¶ 31).

A. PLRA Administrative Exhaustion

The Court finds that Defendant has carried his burden to show by a preponderance of the evidence that Plaintiff failed to exhaust his administrative remedies as required by the PLRA.

The evidence shows that Sergeant Eric Colby was the Grievance Sergeant during the time period of Plaintiff's retaliation allegations, and retained this position through approximately July of 2023. (Tr. at 83:3-18). Despite Colby's concession that while he was familiar with the exhaustion policies it "had been awhile," the Court found the witness to be truthful, cooperative, and competent to testify about the OCSO Grievance Policy and his experience with the procedures he implemented.

Specifically, Colby testified concerning the difference between "complaints" and "grievances," and specified that while "grievances" are typically written out on a "facility-provided grievance form," he would accept a grievance even if it was not written on such a form. (Tr. at 84:4-90:14; CE 2 ¶10; Ex. 39). Additionally, the Court found credible Colby's testimony that there is no initial "vetting" process for grievances, and that grievance boxes are accessible and located in every housing unit and checked daily. (CE 2 ¶ 9; Tr. at 92:22-93:17). While Colby was cross-examined concerning "exclusions" that appear in the OCSO Grievance Policy and New York State minimum standards, Colby credibly testified that despite such carve-outs, it was still policy to hand out the grievance form to the requesting inmate, which effectively means that there are no topics that cannot be subject to the grievance procedure. (Tr. at 93:24-94:9 ("New York State minimum standards does carve out ones that are not in the grievance process, but our policy indicates that a grievance is handed out any time that it's requested and the issue can't be resolved by the end of your shift.")). Finally, Colby testified that he reviewed Plaintiff's grievance file and the 2022 Grievance Logbook, and though Plaintiff had filed two grievances during the 2022

29

period, neither was related to the relevant allegations, nor were they made during the September through December 2022 period. (CE 2 ¶¶ 12-15; Exs. 40, 45).

Based upon Colby's testimony and review/explanation of Plaintiff's grievance file and the 2022 Grievance Logbook, the Court finds that Defendant has sufficiently carried his burden to show that Plaintiff failed to exhaust his administrative procedures. The Court does recognize, however, that the PLRA exhaustion requirement may be excused where it can be credibly shown that the administrative remedies are unavailable to the inmate, or where "officials prevented him from utilizing a grievance procedure." *See Arnold*, 245 F. Supp. 2d at 537; *see also Ross*, 578 U.S. at 642-45.

Here, Plaintiff testified that: i) he attempted to submit a grievance form, but was denied one by Sergeants Nehrkorn and Conroy; ii) he was told by "Grievance Coordinator Colby, Sgt. Colby, and other officers . . . of OCJ" his concerns could not be the subject of a grievance; and iii) he also "wrote a grievance from a regular piece of paper, [and] put it in the grievance box," but it was never properly filed. (*See supra* at Sec. IV.A.i. at 7). Upon review of the evidence set forth by Defendant, and in light of Plaintiff's demeanor and lack of credibility as a witness at trial, the Court declines to credit Plaintiff's assertions. First, the Court finds Colby to be a competent and credible witness, based on his demeanor, experience, and general temperament at trial. Accordingly, the Court credits his testimony that there are no inmate issues that are not subject to the grievance procedure and that the grievance box is checked daily. On the other hand, the Court declines to credit Plaintiff's unsupported and incredible testimony that he was told that his issue was not grievable or that he placed his grievance in the box and it was not properly handled. The Court notes that Plaintiff appears to be well-versed in the grievance procedure, having filed two in the year 2022, and having filed the Underlying Lawsuit previously. (Tr. at 98:22-99:7).

30

Additionally, the Court notes that one of the grievances filed by Plaintiff in 2022 was written on a piece of paper, lending additional credence to Colby's testimony that he would accept a grievance that is not written on the proper grievance form. (*See* Ex. 40; CE 2 ¶ 10). Based on the above, and a review of the evidence and testimony at trial, the Court affords no weight to Plaintiff's testimony concerning his purported failed exhaustion attempts.

Accordingly, the Court concludes that even if Plaintiff had sufficiently established his retaliation claim, Defendant has satisfied his burden of proof on this affirmative defense, *i.e.*, that Plaintiff failed to exhaust his administrative remedies under the PLRA.[18]

## CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiff has failed to establish his First Amendment Retaliation claim by a preponderance of the evidence. The Court also concludes that even if Plaintiff had established a *prima facie* case for retaliation, Defendant has established by a preponderance of the evidence that Plaintiff failed to sufficiently exhaust his administrative remedies according to the PLRA, warranting dismissal of Plaintiff's case.

The Complaint is therefore DISMISSED.

The Clerk of Court is respectfully directed to enter judgment in Defendant's favor and close this case.

**SO ORDERED:**

Dated:    White Plains, New York
          February 23, 2026

_____
PHILIP M. HALPERN
United States District Judge

---

[18] The Court, in light of the holdings herein, need not and does not reach Defendant's alternative qualified immunity affirmative defense.

31